J-S20043-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.A.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 214 MDA 2021 |

Appeal from the Decree Entered January 15, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9059

| | | |
|---|---|---|
| IN THE INTEREST OF: C.F.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.A.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 215 MDA 2021 |

Appeal from the Decree Entered January 15, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9060

| | | |
|---|---|---|
| IN THE INTEREST OF: L.D.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.A.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 216 MDA 2021 |

Appeal from the Decree Entered January 15, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9061

| | | |
|---|---|---|
| IN THE INTEREST OF:  I.D.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

APPEAL OF:  D.A.K., MOTHER      :
:
:
:
:
:
:   No. 217 MDA 2021

Appeal from the Order Entered January 15, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9062

| IN THE INTEREST OF: D.F.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.A.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 218 MDA 2021 |

Appeal from the Order Entered January 15, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9063

| IN THE INTEREST OF: J.L.K., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: D.A.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 219 MDA 2021 |

Appeal from the Decree Entered January 15, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9064

| IN THE INTEREST OF: R.R.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: D.A.K., MOTHER | : | |
| | : | |

- 2 -

:
:
:
:    No. 220 MDA 2021

Appeal from the Decree Entered January 15, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9065

BEFORE:  NICHOLS, J., KING, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:       **FILED: SEPTEMBER 17, 2021**

Mother, D.A.K., ("Mother"), appeals from the Decrees granting the Petitions filed by the Luzerne County Children and Youth Services ("CYS," or the "Agency") seeking to involuntarily terminate the parental rights of Mother to her seven children:  A.M.K. (a female born in July 2004); C.F.C., (a female born in March 2014); L.D.C., (a female born in June 2009); I.D.C., (a female born in May 2011); D.F.C., (a female born in January 2013); J.L.K., Jr., (a male born in February 2018); and R.R.K., (a female born in April 2019) (collectively, the "Children"), pursuant to the Adoption Act (the "Act"), 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1, 2]  We affirm.

The trial court set forth the factual background and procedural history of these consolidated appeals as follows:

> On August 20, 2020, [CYS] filed Petitions for the Involuntary Termination of Parental Rights (["]Petition[s"]) as to [the Children].  [CYS] sought to terminate the parental rights of [Mother] and the respective natural father of each child.

---

[1] Mother has another child, V.K., Jr. (a male born in September 2005), who was not a subject of the termination Petitions.

[2] None of the Children's fathers has filed an appeal, nor has any father participated in Mother's appeal.  **See** Trial Court Opinion, 3/19/21, at 3.

- 3 -

* * *

It is unrebutted that R.R.K. was placed [in foster care] on April 22, 2019, and the remaining six (6) children have been in [foster care] placement since January 7, 2019. Initially, [CYS] sought a shelter order because there were concerns regarding Mother's substance abuse issues[,] as Mother overdosed on illegal substances. In addition to substance abuse issues, [CYS] also had concerns of domestic violence in the home, Mother's anger issues and [Mother's] outbursts toward the [C]hildren. *Id.* With respect to A.M.K., she was originally placed on January 7, 2019[,] and then placed on [*sic*] September 2019 with the paternal grandmother. However, the paternal grandmother left [A.M.K.] with Mother unsupervised against [a] court order. Thus, A.M.K. was returned to the custody of [CYS] on March 5, 2020.

Trial Court Opinion, 3/19/20, at 2, 4.

The trial court held evidentiary hearings regarding the termination Petitions and goal changes on December 7, 2020, December 15, 2020, and January 12, 2021. At the hearing on December 7, 2020, Christopher Harrison, Esquire, and Harry Skene, Esquire, appeared on behalf of the Agency. Mother appeared with her counsel, Robert Kobilinski, Esquire, and Ashley Messoline, Esquire. Tiffany Crispell, Esquire, appeared as both guardian *ad litem* ("GAL") on behalf of all the Children and legal interest counsel for the Children except A.M.K. Maria Turetsky, Esquire ("Attorney Turetsky"), appeared as legal interest counsel on behalf of A.M.K. N.T., 12/7/20, at 4-7. At the hearing on December 7, 2020, the Agency presented the testimony of Angelica Beaver ("Beaver"), a caseworker with the Agency. *Id.* at 25. The Agency also presented the testimony of George Hockenbury, who is employed by Northern Tier Research, a toxicology facility that tests urine and blood, and conducts

drug testing, where he reviews drug screens. *Id.* at 41-42. Additionally, the Agency presented the testimony of Jacqueline Marrero, who is employed by Pathway to Recovery ("Pathway"), an outpatient drug and alcohol facility and mental health facility, as a drug and alcohol treatment specialist and a mental health professional. *Id.* at 54-55. Finally, the Agency presented the testimony of Cathy Sheridan, who is employed as a parent educator by Concerned, a private foster care agency contracted with the Agency to provide a community-based program. *Id.* at 73.

At the hearing on December 15, 2020, Mother presented the testimony of Stacey Kittrick, Mother's case manager at the Day Reporting Center. N.T., 12/15/20, at 10. Mother also testified on her own behalf. *Id.* at 31. The Agency then presented the testimony of Beaver. *Id.* at 56.

At the hearing on January 12, 2021, the Agency presented additional testimony from Beaver. N.T., 1/12/21, at 95. Mother again testified on her own behalf. *Id.* at 124. Attorney Turetsky presented the testimony of Beth Distasio, the court-appointed special advocate for A.M.K. *Id.* at 139.

The trial court made findings of fact based upon the testimonial and documentary evidence at the hearings, which it found credible. *See* Trial Court Opinion, 3/19/21 at 7-21. We adopt those findings as though they were fully set forth herein. *See id.*

On January 15, 2021, the trial court entered Decrees terminating the parental rights of Mother to the Children pursuant to 23 Pa.C.S.A.

- 5 -

§ 2511(a)(2), (5), (8), and (b). On February 11, 2021, Mother timely filed separate Notices of Appeal, along with Pa.R.A.P. 1925(a)(2)(i) and (b) Concise Statements of errors complained of on appeal as to each of the termination Decrees. On March 23, 2021, this Court, *sua sponte*, consolidated Mother's appeals.

In her brief on appeal, Mother raises one issue:

A. Whether the trial court erred in terminating parental rights and/or abused its discretion in giving primary consideration pursuant to the factors set forth in 23 Pa.C.S.A. [§] 2511(b) (developmental, physical, and emotional needs and welfare of the child)[,] because testimony presented at trial established a strong parent-child bond that would be detrimental to the physical, emotional, and general well-being of the [Children] if the bond were to be severed?

Mother's Brief at 2.[3]

Mother argues that CYS failed to meet its burden of clear and convincing evidence to terminate her parental rights pursuant to 23 Pa.C.S.A. § 2511(b), and that the trial court failed to give primary consideration to subsection (b). Mother's Brief at 11. Mother asserts that her own testimony clearly established that a parent-child bond exists between her and each of the Children, and that the Agency has failed to prove that it would not be

---

[3] In the Statement of Questions Involved portion of her brief on appeal, Mother does not challenge the termination of her parental rights based on section 2511(a), and, accordingly, she has waived any such challenge under section 2511(a). **See Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's statement of questions involved is deemed waived). Nevertheless, we will address section 2511(a) *infra*.

detrimental to sever the parent-child bond between her and the Children. *Id.* at 12. Mother urges that she was not provided proper visitation with the Children. *Id.* at 13. Mother asserts that, when she did have supervised visits, she played games and puzzles with the Children and performed many activities, as permitted by the Agency's facility and the supervised visitation. *Id.* Mother claims that she also speaks with her oldest child in this matter, A.M.K., every day, and that she was the primary caregiver for the Children prior to their placement. *Id.* (citing N.T., 1/12/21, at 125-33). Mother alleges that she was unjustly denied the correct visitation hours, as the COVID-19 pandemic permitted her to have only video visits with the Children for nearly a year, to her detriment. *Id.* Mother states that the Children share and reciprocate the bond that has been established with her, and that severing that bond, by terminating Mother's parental rights, would not be in the best interests of the Children. *Id.* Mother claims that she has provided love, and more, to the Children. *Id.* Mother further asserts that she can safely and adequately provide for the Children, and that she has done so throughout their lives. *Id.* According to Mother, the best interests of the Children are met by continuing to allow Mother to work toward completing all services that necessitated their placement in foster care. *Id.* at 14.

In reviewing the trial court order granting a petition to terminate parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a

petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, [], 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) [(plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, … 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, as we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and

- 8 -

convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Although Mother has waived this issue, we set forth the following analysis to demonstrate that even if she had preserved such a challenge, it would have lacked merit. We address sections 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. **See In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. **In re A.L.D.** 797 A.2d 326, 337 (Pa. Super. 2002).

The trial court made determinations with regard to section 2511(a)(2). **See** Trial Court Opinion, 3/19/21, at 5-21. Because the trial court's determinations are supported by competent, clear and convincing evidence in the record, we adopt the trial court's rationale and analysis as if they were fully set forth herein. **See id.**

Next, this Court has stated that the focus in terminating parental rights under section 2511(a) is not on the parent, but it is on the child pursuant to

section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A]. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who,

after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. … Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in [and] of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

- 12 -

The trial court addressed Mother's issue regarding section 2511(b) in its well-reasoned Opinion. *See* Trial Court Opinion, 3/19/21, at 3, 32-35. The trial court's determination that the Agency satisfied the requirements of section 2511(b) is supported by competent, clear, and convincing evidence in the record. Thus, we adopt the trial court's Opinion and analysis as if they were fully set forth herein. *See id.*

Accordingly, we affirm the trial court Decrees terminating Mother's parental rights as to the Children.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/17/2021

| | | |
|---|---|---|
| IN THE INTEREST OF | : | IN THE COURT OF COMMON |
| | : | PLEAS OF LUZERNE COUNTY  RECORDED |
| A.M.K. | : | ORPHAN'S COURT DIVISION  03/19/2021 1:29:36 PM  JUDICIAL SERVICES & RECORDS  LUZERNE COUNTY  PENNSYLVANIA |
| | : | |
| Appeal of D.A.K. | : | NO. A-9059  Inst Num:  202116697 |
| | : | 214 MDA 2021 |

| | | |
|---|---|---|
| IN THE INTEREST OF | : | IN THE COURT OF COMMON |
| | : | PLEAS OF LUZERNE COUNTY  RECORDED |
| C.F.C. | : | ORPHAN'S COURT DIVISION  03/19/2021 1:30:17 PM  JUDICIAL SERVICES & RECORDS  LUZERNE COUNTY  PENNSYLVANIA |
| | : | |
| Appeal of D.A.K. | : | NO. A-9060  Inst Num:  202116698 |
| | : | 215 MDA 2021 |

| | | |
|---|---|---|
| | | RECORDED  03/19/2021 1:31:16 PM |
| IN THE INTEREST OF | : | IN THE COURT OF COMMON  JUDICIAL SERVICES & RECORDS  LUZERNE COUNTY |
| | : | PLEAS OF LUZERNE COUNTY  PENNSYLVANIA |
| L.D.C. | : | ORPHAN'S COURT DIVISION  Inst Num:  202116700 |
| | : | |
| Appeal of D.A.K. | : | NO. A-9061 |
| | : | 216 MDA 2021 |

| | | |
|---|---|---|
| IN THE INTEREST OF | : | IN THE COURT OF COMMON |
| | : | PLEAS OF LUZERNE COUNTY  RECORDED |
| I.D.C. | : | ORPHAN'S COURT DIVISION  03/19/2021 1:31:46 PM  JUDICIAL SERVICES & RECORDS  LUZERNE COUNTY  PENNSYLVANIA |
| | : | |
| Appeal of D.A.K. | : | NO. A-9062  Inst Num:  202116701 |
| | : | 217 MDA 2021 |

| | | |
|---|---|---|
| IN THE INTEREST OF | : | IN THE COURT OF COMMON |
| | : | PLEAS OF LUZERNE COUNTY |
| D.F.C. | : | ORPHAN'S COURT DIVISION  RECORDED  03/19/2021 1:32:31 PM |
| | : | JUDICIAL SERVICES & RECORDS  LUZERNE COUNTY |
| Appeal of D.A.K. | : | NO. A-9063  PENNSYLVANIA |
| | : | 218 MDA 2021  Inst Num:  202116702 |

| IN THE INTEREST OF | : | IN THE COURT OF COMMON |
| | : | PLEAS OF LUZERNE COUNTY RECORDED |
| J.L.K., JR. | : | ORPHAN'S COURT DIVISION 03/19/2021 1:33:09 PM |
| | : | JUDICIAL SERVICES & RECORDS |
| | | LUZERNE COUNTY |
| Appeal of D.A.K. | : | NO. A-9064    PENNSYLVANIA |
| | | Inst Num:    202116703 |
| | : | 219 MDA 2021 |

| IN THE INTEREST OF | : | IN THE COURT OF COMMON |
| | : | PLEAS OF LUZERNE COUNTY |
| | | RECORDED |
| R.R.K. | : | ORPHAN'S COURT DIVISION 03/19/2021 1:33:39 PM |
| | : | JUDICIAL SERVICES & RECORDS |
| | | LUZERNE COUNTY |
| Appeal of D.A.K. | : | NO. A-9065    PENNSYLVANIA |
| | | Inst Num:    202116704 |
| | : | 220 MDA 2021 |

## <u>MEMORANDUM ISSUED PURSUANT TO PA.R.A.P. 1925(a)</u>

## I.    <u>PROCEDURAL HISTORY</u>

On August 20, 2020, Petitioner, Luzerne County Children and Youth Services (Children and Youth), filed Petitions for the Involuntary Termination of Parental Rights (Petition) as to each of the following children: A.M.K., C.F.C., L.D.C., I.D.C., D.F.C, J.L.K., Jr., and R.R.K. Children and Youth sought to terminate the parental rights of natural mother (Mother) and the respective natural father of each child.

Several hearings were held commencing on December 7, 2020 and concluding on January 12, 2021. The hearings addressed goal change petitions as well as involuntary termination of parental rights petitions. This Court issued decrees terminating the parental rights of all three natural fathers and the parental rights of natural Mother for all seven children on January 13, 2021.

2

Particularly, Mother's parental rights was terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2), §2511 (a) (5) and §2511 (a)(8). In entering the decrees, the Court gave primary consideration to the developmental, physical, and emotional needs and welfare of the children pursuant to 23 Pa.C.S.A. § 2511(b).

On February 11, 2021, Mother, by and through her Court-Appointed Counsel, filed a Notice Appeal to the Superior Court and the requisite Statement of Matters Complained of on Appeal. None of the fathers appealed. Mother's Statement of Matters Complained of on Appeal is as follows:

1. The Trial Court erred in terminating parental rights pursuant to the requirements of the Adoption Act of 1980, October 15, PL. 934, No. 163 §1, et. seq.

2. Specifically, the Trial Court abused its discretion, committed an error of law, and/or there was insufficient evidentiary support for the Court's decision that the best interests of the minor child would be served by terminating Appellant's parental rights.

3. Appellant reserves the right to amend this document within a reasonable time after receipt of the transcript.

## II. **FINDINGS OF FACT**

There are seven minor children in this case. The minor child, R.R.K.'s date of birth is April    , 2019. A.M.K.'S date of birth is July    , 2004. L.D.C.'S date of birth is June    , 2009. I.D.C.'S date of birth is May    , 2011. D.F.C.'S date of birth is January    ', 2013, and C.F.C.'S date of birth is March    , 2014. J.L.K. Jr.'s date of birth is February    , 2018. N.T. 12/7/20, at 104. This appeal involves the proposed termination of Mother's parental rights.

3

It is unrebutted that R.R.K. was placed on April 22, 2019, and the remaining six (6) children have been in placement since January 7, 2019. Initially, Children and Youth sought a shelter order because there were concerns regarding Mother's substance abuse issues as Mother overdosed on illegal substances. In addition to substance abuse issues, Children and Youth also had concerns of domestic violence in the home, Mother's anger issues and outbursts toward the children. *Id.* With respect to A.M.K., she was originally placed on January 7, 2019 and then placed on September 2019 with the paternal grandmother. However, the paternal grandmother left the child with Mother unsupervised against court order. Thus, A.M.K. was returned to the custody of Children and Youth on March 5, 2020. *Id.*

In meeting its requisite burden of proof by clear and convincing evidence regarding the termination of parental rights of Mother, Petitioner offered the testimony of Angelica Beaver, caseworker at Luzerne County Children and Youth, George Hockenbury, an employee at Northern Tier research, a toxicology facility; Jacqueline Marrero, a drug and alcohol treatment specialist and a mental health professional at "Pathways to Recovery"; and Ms. Cathy Sheridan, a parent educator at Concerned, a private foster care agency. Additionally, Mother offered the testimony of Ms. Stacey Kittrick, Mother's case manager at the Day Reporting Center. Mother also testified on her own behalf on December 15, 2020. The court appointed legal counsel for A.M.K. offered the testimony of Beth Distasio, the Court Appointed Special Advocate, for A.M.K.

4

III. **CONCLUSIONS OF LAW**

After consideration of the credible evidence as summarized above and more detailed below, the Court concludes:

(1) Children and Youth has shown by clear and convincing evidence that the parental rights of the Mother to the minor children, R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr. should be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(2), 23 Pa.C.S.A. Section 2511 (a)(5) and 23 Pa.C.S.A. Section 2511 (a)(8).

(2) Children and Youth has shown by clear and convincing evidence that the termination of the parental rights of the Mother as to the minor children, R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr. best serves the needs and welfare of the children pursuant to 23 Pa. C.S.A. Section 2511(b).

IV. **DISCUSSION: GROUNDS FOR TERMINATION OF MOTHER'S PARENTAL RIGHTS**

The statute permitting involuntary termination of parental rights in Pennsylvania, 23 Pa. C.S.A. Section 2511, sets forth the certain irreducible minimum requirements of care that parents must provide to their children. A parent who cannot or will not meet the requirements within a reasonable time following the intervention by the State may properly be considered unfit and may properly have his or her rights terminated. *In Re: J.T. and R.T.*, 817 A.2d 505 (Pa. Super. 2002).

5

Termination of parental rights is an issue of constitutional dimensions because of the fundamental right of an individual to raise his or her own child. Therefore, in proceedings terminating parental rights, the Petitioner must prove by clear and convincing evidence that the statutory criteria have been met. *Santosky v. Kramer*, 455 U.S. 745 (1982), *In Re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). However, as the Pennsylvania Supreme Court has stated "a parent's basic constitutional right to custody and rearing of his or her child is converted upon the failure to fulfill his or her parental duties to the child's right to have proper parenting in fulfillment of his or her potential in a permanent, healthy, safe environment." *In Re: J.A.S., Jr.*, 820 A.2d 774 (Pa. Super. 2003), *citing In the Interest of Lillie*, 719 A.2d 327 (Pa. Super 1998).

### A. 23 Pa. C.S.A. Section 2511 (a)(2)

A Court may terminate parental rights under Section 2511(a)(2) when:

> The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

Accordingly, Mother's parental rights to the children, R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr., can be terminated under Section 2511(a)(2) of the statute. Credible testimony at the hearing was presented to show by clear and convincing evidence that Mother continued to struggle with her substance abuse, her mental health issues and her parenting of the children. Despite Mother's completion of the parenting courses offered to her, Mother was not able to benefit from the services offered. As a result of Mother's issues with substance abuse, her issues with mental health concerns and her inability to

6

implement what she learned in parenting courses, Mother is unable to provide the proper and essential care for her children that is necessary for their well-being.

Angelica Beaver, caseworker at Luzerne County Children and Youth, testified that the children were placed in the custody of Children and Youth on January 7, 2019. The minor child, A.M.K. was placed with her paternal grandmother in September 2019, but then was returned into the custody of Children and Youth in March 2020. N.T. 12/7/20 at 26.

Placement of the children was necessary due to ongoing issues of illicit drug usage and domestic violence between Mother and her paramour. A safety plan was put into place for the maternal grandmother to supervise contact between Mother and the children. However, in January, the maternal grandmother related to the Children and Youth that she could no longer supervise the contact between Mother and the children. *Id.* at 27. Furthermore, Ms. Beaver stated that while children were in the custody of the maternal grandmother, she was leaving the residence at night without the children and staying at a hotel with her boyfriend. N.T. 1/12/21 at 112. Thus, Children and Youth obtained a shelter care order and the children were placed into various foster homes. N.T. 12/7/20 at 27. According to Ms. Beaver, the children were removed because of the violation of the safety plan, in addition to the maternal grandmother reporting that she was no longer able to take care of the children. N.T. 1/12/21 at 113.

Mr. George Hockenberry testified that he is employed at Northern Tier research which is a toxicology facility. As part of his employment, Mr.

7

Hockenberry is involved in technical business development, including the reviewing of screening and confirmatory procedures. Mr. Hockenberry testified that between January 2019 and the time of trial, Northern Tier tested thirty (30) of Mother's urine samples. N.T. 12/7/20 at 46. Of the thirty (30) screens, there were two positive results for an undetected substance. Mr. Hockenberry testified the most recent result was on July 7, 2020 which was positive for oxazepam, nordazepam, Temazepam, 7-Temazepam, and 7-Aminoclomazepam. According to Mr. Hockenberry, there were two different benzodiazepins that were detected. Therefore, either Valium, Restoril or Klonopin were present on that date. On October 4, 2019, Mother was positive for ethyl glucuronide which is ethyl alcohol metabolite. Mr. Hockenberry explained that Mother's level of alcohol use was 1,150 nanogram per milliliter which is indicative of alcohol use within the last (eighty) 80 hours. On January 10, 2019 Mother tested positive for opiates which was confirmed as morphine. Mr. Hockenberry stated that there were no medications declared reflecting the presence of morphine in the prescription medications. *Id.* at 46, 50-51.

Mr. Hockenberry stated that there were three (3) of Mother's screens detected with abnormal oxidants. The screens were on September 5, 2019, October 1, 2019, and October 30,2019. Mr. Hockenberry testified that when a screen is detected with an abnormal oxidant, it may mean that there is a severe urinary tract infection which he does not believe to be in Mother's case due to level detected. The screen may also mean that it is a substance, such as bleach, which was added to the sample. *Id.* at 46-47.

8

Mr. Hockenberry testified that between January 2019 to the time of trial, he noticed that there were large gaps in time between the samples that were submitted by Mother. Mr. Hockenberry stated that prior to July 7, 2020, the preceding date upon which Mother submitted was October 31, 2019. *Id.* at 47-48, 51.

Ms. Beaver testified that Mother was required to submit to one hundred and ten (110) toxicology screens. Of those screens, Mother only attended thirty (30) screens. *Id.* at 46, 111.

Ms. Jacqueline Marrero testified that she is a drug and alcohol treatment specialist and a mental health professional at a facility known as Pathways to Recovery (Pathways). *Id.* at 54-55. Ms. Marrero testified that Pathway received a referral from Luzerne County Children Youth for Mother to engage in drug and alcohol treatment and mental health services. *Id.* at 55.

Ms. Marrero testified that Mother began her treatment at Pathway on August 9, 2019. She engaged in drug alcohol treatment which consisted of the "relapse prevention group", the "addiction education group", and "life choices" for anger management. *Id.* at 55-56.

Ms. Marrero testified that in the addiction education group, Mother was required to attend sessions once per week for six weeks. Ms. Marrero explained that once Mother completed the addiction education group, she would be eligible to begin attending the relapse prevention group. The relapse prevention group consists of one session per week for eight weeks, and the anger management group consists of one session per week for ten (10) weeks. *Id.* at 56-57.

9

Ms. Marrero testified that Mother was discharged unsuccessfully because she was not seen in over thirty (30) days. Ms. Marrero testified that Mother completed the addiction education group program and moved onto the next level of the relapse prevention group. Then, according to Ms. Merraro, "all of a sudden" Mother just stopped attending the sessions. Ms. Marrero explained that pursuant to the department of drug and alcohol standards, in the event there is no contact from the individual within thirty (30) days, that individual's program discontinued. *Id.* at 56. Therefore, Mother was "closed out" of her case on January 24, 2020. Ms. Marrero testified that she believes that Mother completed the anger management program, but did not complete the relapse prevention group program. In order to successfully complete the program, Mother must complete all three services, the addiction education group, the anger management, and the relapse prevention group. *Id.* at 58.

Ms. Marrero testified that Mother re-engaged with Pathways for drug and alcohol treatment in September 2020, subsequent to the filing date of the petition to terminate her parental rights which was filed on August 20, 2020. Mother was recommended outpatient. Mother was recommended to attend "Seeking Safety" group", "Trauma for Women's" group based on trauma and substance abuse and individual sessions. The programs meet once per week for ten (10) weeks. Each week addressed a different topic. The program assists individuals with a substance abuse history and trauma and helps the individuals focus on strategies to learn how to deal with those traumas. *Id.* at 59. Mother was also required to attend individual sessions twice per month. Ms. Merraro stated that the individual sessions did not occur as scheduled due to Ms.

10

Merraro's schedule and Mother not appearing to the appointments. Ms. Marrero testified that in September 2020, Mother did not successfully complete the drug and alcohol treatment portion through Pathways. Mother was "closed out" of Pathways for drug and alcohol treatment on November 17, 2020 due to Mother not attending the program for thirty (30) days. *Id.* at 60-61.

Ms. Marrero testified that Mother was referred for mental health services by Luzerne County Children and Youth in August 2019. Ms. Marrero stated that the treatment plan recommended that Mother engage in mental health services, including individual sessions and medical management. According to Ms. Marrero, Mother would have individual sessions with a therapist and would be prescribed medication management through Pathways. *Id.* at 61-62. Ms. Marrero testified that she was meeting with Mother once or twice per month for her mental health treatment. However, on June 22, 2020, Mother was also discharged unsuccessfully for her mental health treatment. According to Ms. Merraro, Mother was missing her doctor's appointments and was also missing her individual sessions. Ms. Marrero stated that Mother did re-engage with Pathways for mental health treatment services on August 14, 2020. Ms. Marrero testified that Mother currently sees a different therapist for mental health services. However, Mother was "closed out" for the drug and alcohol services. *Id.* at 63-64.

Therefore, Ms. Merraro testified that in both 2019 and 2020, Mother did not successfully complete the drug and alcohol treatment through Pathways. Ms. Merraro also checked her notes during the hearing and stated that Mother did not complete the anger management group program. Mother only attended five

of the ten groups. Ms. Marrero, however, could not explain why there was a letter dated December 12, 2019 generated by "Maureen" stating that Mother had successfully completed the anger management group. *Id.* at 65-66, 70-71. The Court finds that in the event Mother did complete the anger management group, she did not benefit from the program as indicated in Ms. Sheridan's testimony and Ms. Beaver's testimony summarized below.

Ms. Cathy Sheridan testified that she is a parent educator at Concerned, a private foster care agency. The agency is a community-based program that contracts with a Luzerne County Children Youth to provide parenting education and case management. Ms. Sheridan explained that she works in the "Intensive Family Reunification Service" program (IFRS). According to Ms. Sheridan, the program works with clients to help them achieve their goals of reunification with their children. Concern assists parents with needs such as housing, employment, substance abuse therapy, mental health treatment, and parenting education. *Id.* at 73-74.

Ms. Sheridan indicated that Mother was referred to Concern by Luzerne County Children and Youth in order to engage in parenting education. Ms. Sheridan testified that she began working with Mother on November 7, 2019. Ms. Sheridan testified that she worked with Mother in the parenting program which utilized a workbook comprising of fifty (50) chapters. Ms. Sheridan met with Mother on a weekly basis. Ms. Sheridan stated that although Mother finished the parenting program, she had some concerns regarding Mother. *Id.* at 77. Ms. Sheridan testified that Mother had an altercation with another individual at work and she broke or strained her wrist. Mother was also arrested and incarcerated

12

for an incident regarding her oldest daughter. These allegations charged Mother with chasing her daughter down the street with knife. Mother was also alleged to have brought A.K. back from Philadelphia and thereafter hiding the child in her home. Ms. Sheridan was also concerned with Mother's anger, her physical and mental aggressiveness and substance abuse issues. Ms. Sheridan testified that during parenting sessions Mother did not handle her feelings appropriately when she became angry. This inability to address anger appropriately gave Ms. Sheridan some concerns relating to Mother parenting a child. Ms. Sheridan stated that Mother became very defensive when she discussed the aforementioned altercation with her daughter. *Id.* at 80.

With respect to case management, Ms. Sheridan indicated that Mother at the time had appropriate housing and was dealing with her mental health issues. However, Ms. Sheridan noticed that Mother was engaging in erratic behavior. Ms. Sheridan addressed that issue with Mother; however, Mother denied any drug usage. Ms. Sheridan stated that during some telephone conversations with Mother, Mother was behaving in an "odd" manner and her personality was "off". According to Ms. Sheridan, Mother seemed anxious and was yelling the entire time with Ms. Sheridan not able to have a conversation with her. *Id.* at 79, 83. Mother also became defensive and blamed others and Children and Youth for not working with her. Ms. Sheridan then stated that although Mother completed her parenting education program, she would not have recommended reunification with her children due to her concerns. *Id.* at 80.

Ms. Sheridan was also concerned that there may be a financial issue should the children be returned to Mother. Ms. Sheridan stated that at the time

13

she finished working with Mother, Mother no longer had employment. Mother originally had two-part time jobs but did not have a job when she completed the parent program. *Id.* at 86.

As part of the family service plan which was developed and adopted as a court order outlining the services for Mother, Mother was ordered to obtain safe and stable housing, complete a course in parenting, engage in drug and alcohol treatment, engage in mental health treatment, participate in random urinalysis and participate in family therapy with the oldest biological daughter. *Id.* at 105.

Ms. Beaver testified that at the time of trial, Mother had not successfully completed drug and alcohol treatment. According to Ms. Beaver, Mother also had not successfully engaged in mental health services. *Id.* at 105-106. With respect to parenting education services, Ms. Beaver stated that although Mother completed those services, concerns remain regarding Mother's ability to effectively parent. Mother still had a lack of ability to control her anger. There were ongoing allegations of drug usage, lack of employment and her inability to financially support her children.

Mother also had not consistently engaged in the random urinalysis that she was required to do. *Id.* at 106. The "color system" requires an individual to submit to testing if he/she phones Children and Youth and his/her color is indicated on any given day. Ms. Beaver stated that Mother was assigned the color blue. Based on the color system, Mother would be submitting to two urine screens per week; however, Mother did not submit consistently to these screens. Between October 2019 and July 7, 2020 Mother did not call in to submit to the screens. It was not until July 7, 2020 that Mother submitted a screen. At the time

14

of trial, Mother had not submitted any urine screens since September 21, 2020. *Id.* at 107. Ms. Beaver testified that when Mother did appear in July 2020 to submit to a urinalysis, her test was positive for illegal substances. *Id.* at 107.

Ms. Beaver testified that throughout the life of the case, Mother was not always responsive and available for her children. When R.M.K., had several issues at daycare, Ms. Beaver was unable to contact Mother. Ms. Beaver testified that she continued to make efforts to keep consistent contact with Mother and attempt to contact her either through a phone call or text message. *Id.* at 108.

Ms. Beaver also stated that Mother did not keep Children and Youth apprised of her change of residence. Ms. Beaver stated that she had attempted an unannounced visit at Mother's home. However, on one occasion, an unknown male was in the residence and Ms. Beaver did not want to come in the house. Another time, Mother was not present at the home. Ms. Beaver testified that at the time of trial, she was not aware as to whether her Mother secured safe and stable housing for the children due to Mother's lack of contact. Ms. Beaver believes that Mother is not in a position to care for her children. Ms. Beaver explained that the reasons for placement have not been rectified. Ms. Beaver stated that there remains concern for domestic violence and physical violence in the home. There are also concerns for drug abuse. Also, Mother's home has not been assessed to determine safety and stability due to lack of contact. *Id.* at 109.

Ms. Beaver testified that Mother is behaving in the same manner that she did at the time of placement of the children. For instance, Ms. Beaver observed some supervised visits between Mother and the children and Ms. Beaver had to intervene due to Mother arguing with the children. Ms. Beaver stated that Mother

15

called one of her daughters a "liar". Ms. Beaver had to intervene between Mother and A.M.K. at one point. According to Ms. Beaver, Mother had also become aggressive with her and yelling at her. Ms. Beaver testified that there were times when the visits had to end early as a result of Mother yelling and swearing. *Id.* at 110. Ms. Beaver stated that she did not believe that Mother had made any substantial progress toward alleviating the reasons for placement. *Id.* Ms. Beaver testified that during the course of the case, Mother was never awarded unsupervised visits with the children. The visits were always supervised. *Id.* at 119.

Ms. Beaver testified that there were times when she asked Mother to submit to a toxicology screen on a specific day and Mother would report that she was submitting to the screens; however, Mother would not appear for the screens. *Id.* at 111. Ms. Beaver testified that Mother was also offered bus passes in order to submit to the toxicology screen. However, she stated that Mother did not utilize the bus passes for appropriate reasons. *Id.* at 111- 112. Ms. Beaver testified that Mother never consistently submitted for toxicology screens.

Ms. Beaver testified that Mother previously participated in anger management through Pathways, but was unsuccessfully discharged due to her lack of attendance. *Id.* at 114. Ms. Beaver further stated that initially referral was made for Mother to participate in a domestic violence program; however, she did not successfully complete the program. *Id.* at 116.

In summary, Ms. Beaver testified that Mother completed two courses of parenting. She was referred for domestic violence education at the initial involvement of Children and Youth services. She did not successfully complete

16

the drug and alcohol services, nor did she successfully complete the mental health services. *Id.* at 116 to 117.

Ms. Beaver testified that Mother engaged in drug and alcohol services two separate times with Pathways. According to Ms. Beaver, Mother never consistently participated in the drug and alcohol treatment. Ms. Beaver testified that Mother was "closed out" of Pathway for Drug and alcohol treatment and most recently she was closed out of Pathways most recently in November 2020. *Id.* at 120. She stated that Mother had a consistent history of unsuccessful completion of programs.

Ms. Beaver testified Mother re-engaged in mental health services with Pathways on August 31, 2020, which was subsequent to the date of Children and Youth's filing of the petition to terminate Mother's parental rights. *Id.* at 121. Ms. Beaver testified that Mother was on probation due to prior drug charges. Ms. Beaver indicated that Mother violated her probation on April 2020 when she and her daughter were in the aforementioned involving a knife. According to Ms. Beaver, at the time of the hearing, the children had been in placement for two years. Ms. Beaver stated that she had the same concerns as she did two years ago for the children's safety should they be returned to Mother. *Id.* at 122-123.

Ms. Stacey Kittrick testified that she is Mother's case manager at the Day Reporting Center. Ms. Kittrick testified that the center is a reentry program which offers drug and alcohol treatment, as needed, and provides an environment for offenders to have cognitive behavioral therapy. Ms. Kittrick stated that she began working with Mother on June 25, 2020.

Ms. Kittrick testified that Mother is involved in the program due to Mother being on probation. Mother began the program on June 25, 2020. N.T. 12/15/20 at 18. Ms. Kittrick testified that Mother was on probation due to the charges of simple assault, terroristic threats, and disorderly conduct. *Id.* at 18-19. Ms. Kittrick stated that Mother's involvement with the program was a term of her probationary sentence. Should Mother not participate in the program, then Mother would violate her probation and her probation may be revoked. *Id.* at 19.

Ms. Kittrick testified that she worked with Mother on the areas of personal and antisocial associates. *Id.* at 10-12. Ms. Kittrick testified that she also worked with Mother on anger management. Ms. Kittrick stated that Mother completed the Moral Recognition Therapy (MRT) which consists of positive stories, volunteer hours and different activities meant to change one's way of thinking. *Id.* at 12-13. Ms. Kittrick testified at the time she worked with Mother, Mother's drug screens were "negative". *Id.* at 13. Mother began services for illegal substances at the Day Reporting Center after a term of incarceration. Ms. Kittrick explained that she had no grounds to have Mother undergo drug and alcohol treatment as tested "negative". *Id.* at 14. Ms. Kittrick stated that she had interactions with Mother at least once per week, and she did not have any concern that Mother was under the influence of illegal substances. *Id.* at 14. Ms. Kittrick testified that Mother had been proactive and sent any paperwork that the Day Reporting Center requested. Mother had also been responsive through email and adjusting "back-and-forth" between in person and remote meetings. *Id.* at 14-16. Ms. Kittrick testified that Mother was engaged in individual anger management sessions once per week. *Id.* at 22-23.

18

Ms. Kittrick testified that MRT has three different phases and that Mother completed the first phase. The program is based on MRT steps. Out of the 12 steps in phase 2, Mother was on step five. Once mother completes eight (8) steps, Mother would progress to phase three (3). Phase three (3) consists of Mother having sixty (60) days of sobriety. Ms. Kittrick stated that these are the main goals so that Mother can continue with aftercare once per week. According to Ms. Kittrick, Mother submitted to a drug screen once every other week after submitting to drug screen once per week in phase one (1). *Id.* at 17.

Ms. Kittrick testified that Mother was not required to participate in outpatient treatment for drug and alcohol abuse due to her self-reporting evaluation. According to Mother's self-reporting, she did not have any recent positive screens. Ms. Kittrick testified that Mother self-reported no drug and alcohol use and completed all required random toxicology tests. Ms. Kittrick was questioned on cross examination as to whether she was aware that Mother tested positive for four different prescription medications in July 2020. Ms. Kittrick testified that Mother did not self-report those results. Ms. Kittrick testified that mother needed four to five months to complete the MRT program and begin after care. Id. at 23 to 24. Ms. Kittrick testified that Mother's probation program was not geared toward Mother regaining any custody of children. The program is tailored toward reducing criminogenics risks.

Mother testified that she's been participating in drug and alcohol services at Pathways and at the Day Reporting Center. According to Mother, she was not directed to participate with any specific drug and alcohol treatment provider. Mother indicated that she had the choice to select her own provider.

19

Mother admitted that she did not complete the Pathways program. She stated that she missed her last session and was "closed out" of the program. *Id.* at 33. Mother testified that the only reason she tested positive for substances in July 2020 was due to prescription medication of Klonopin and Flexeril. Mother admitted testing positive for cocaine; however, she stated that the positive testing occurred much earlier in her case. *Id.* at 34 to 35.

Despite Mother's assertion that she was prescribed the medications that revealed a positive testing result on July 7, 2020, Mother was not prescribed oxazepam, nordazepam, Temazepam, 7-Temazepam, and 7-Aminoclomazepam.

Mother testified at the hearing that she was currently attending mental health services at Pathways to Recovery and was treating with a physician. *Id.* at 36. Mother testified that she is prescribed Paxil, Abilify, and Klonopin. On cross examination, Mother agreed that she was participating in the Day Reporting Center due to her probation, Mother also acknowledged that she was court ordered through the underlying dependency proceeding to engage in drug and alcohol treatment services. *Id.* at 42-43. Mother acknowledged that she attended Pathways for drug and alcohol treatment but did not complete the program. *Id.* at 43. Mother claimed that she did not complete the drug and alcohol services at Pathways because she was simultaneously attending the drug and alcohol treatment at the Day Reporting Center. *Id.* at 43-44. However, Mother began participating at the Day Reporting Center as part of her probation, subsequent to be initially referred and discharged from Pathways, without notice to Children and Youth. Also, Mother's attendance at Pathways to Recovery was part of the family service plan.

20

Mother was questioned on cross examination with respect to her testing positive for four different benzodiaspines on July 27, 2020. Mother denied that she tested positive for these substances. *Id.* at 46. Mother admitted that at some point she stopped her mental health treatment and stopped taking her medication for two to three weeks. *Id.* at 47. Mother testified that she was incarcerated in the Spring of 2020 for approximately one week. The charges were simple assault and terroristic threats. *Id.* at 47-48. On cross examination, Mother denied chasing her daughter down the street with a knife. *Id.* at 48.

Mother testified that she completed an anger management program in December 2019. However, in April 2020, Mother had an altercation with her daughter resulting in Mother being criminally charged for simple assault and terroristic threats. *Id.* at 50.

Based on the testimony of the various witnesses, summarized above, and based on the evidence presented to the Court, the Court finds that subsequent to the placement of the children on January 7, 2019, Mother did not complete the required services for mental health treatment and drug and alcohol treatment at Pathways to Recovery. Also, Mother was not able to benefit from the parenting courses despite her completion of the courses. Therefore, the Court finds that Mother has not been able to remedy the conditions that gave rise to the placement of the children.

Unlike 23 Pa.C.S.A. § 2511(a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in

21

subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and . . . this is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." (our emphasis added) *In re E.A.P*, 944 A.2d 79 (Pa. Super 2008).

Given the overwhelming evidence and testimony, it is clear that Mother has received and/or has been offered extensive services over the years and she failed to complete the services or even benefit from the services.

At this juncture, the children's right to have proper parenting in fulfillment of their potential in a permanent, healthy, safe environment outweighs Mother's interest. *In Re: J.A.S., Jr.*, 820 A.2d 774 (Pa. Super. 2003), *citing In the Interest of Lillie*, 719 A.2d 327 (Pa. Super 1998).

## V. DISCUSSION: GROUNDS FOR TERMINATION FOR MOTHER

### A. 23 Pa. C.S.A. Section 2511 (a)(5)

A Court may terminate the parental rights under Section 2511(a)(5) when:

The child has been removed from the care of the parent by the Court or under voluntary agreement with an agency for a period of at least six months, the conditions of which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

Mother's parental rights may also be terminated under this provision of the Statute. Under 23 Pa.C.S.A. Section 2511(a)(5), the agency must show: (1) the children have been removed from the care of the parent by the Court for a period of at least six months; (2) The conditions giving rise to placement continue to

22

exist, (3) Those conditions will not be remedied in a reasonable period of time, and (4) Termination of parental rights would best serve the needs and welfare of the children.

(1) (2) CHILDREN REMOVED BY THE COURT FOR A PERIOD OF A LEAST SIX MONTHS AND CONDITIONS CONTINUING TO EXIST

The minor children, R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr. were originally placed on January 7, 2019. Therefore, the children have been removed from their Mother for at least six (6) months. It is also clear through the testimony outlined above, that the natural Mother has been unable to resolve the issues that gave rise to the placement of the minor children, R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr., i.e. abstain from illegal substances, inability to benefit from the parenting courses and inability to consistently attend the counseling sessions. The overwhelming evidence shows that all of these issues have yet to be remedied by Mother even after participating in mental health treatment, substance abuse treatment and completion of the parenting courses.

The Court has recognized this issue above in its analysis of Section 2511(a)(2) and finds the same considerations apply for 2511 (a)(5) that have already been discussed extensively in this memorandum. Furthermore, the Court applies this same reasoning in concluding that the natural Mother failed to remedy the conditions that originally gave rise to placement of her minor children, R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr.

## (3) REMEDY OF CONDITIONS IN REASONABLE TIME

Mother has had two (2) years to remedy the conditions which gave rise to placement, yet the evidence shows that she has been unable to make any progress. Despite Mother's completion of the parenting courses, Mother lacked the ability to control her temper, i.e., fighting with co-workers and chasing her daughter down the street with a knife and yelling at the caseworker during her visits with the children. Despite her involvement in drug and alcohol treatment with Pathways to Recovery and with the Day Reporting Center, Mother continued to relapse and test positive for non-prescribed substances. Further, Mother was not consistent in attending her drug screens when requested, nor was Mother consistent in attending her counseling sessions. This Court finds that Mother has been and is unable to remedy the conditions that gave rise to placement of the minor children within a reasonable time period.

## (3) NEEDS AND WELFARE OF THE CHILD

The term "needs and welfare" of a child refers to both tangible and intangible needs. The intangible needs of a child include love, comfort, security and closeness. *In re Matsock*, 416 Pa. Super. 520, 611 A.2d 737, 747 (1992). There is nothing in the record that shows that the natural Mother is presently capable of providing a safe, secure environment for the minor children.

Parental duty is best understood in relation to the needs of a child. These needs, both physical and emotional, cannot be met by a mere passive interest in the development of the child. Meeting a child's needs is a positive duty that requires affirmative performance. *In re Shives*, 363 Pa. Super. 225, 525 A.2d 801, 802 (1987).

24

A parent is not relieved of his or her responsibility relating to the needs of a child when a child has been placed in foster care. A non-custodial parent has a duty to exert himself to take and maintain a place of importance in the child's life. *In re Adoption of M.J.H.*, 348 Pa. Super. 65, 501 A.2d 648 (1985). A parent must demonstrate a continuing interest in the child and make a genuine effort to maintain communication and association with the child. *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975). Moreover, a parent with a child in foster care has an affirmative duty to work toward the return of the child. *In Re: William L.*, 477 Pa. 322, 383 A.2d 1228 (1978).

When considering the needs and welfare of the child, it is also important for the court to consider the bond between the parent and the child because severance of a strong parental bond can have a detrimental impact on the child. *Matsock, supra.*

Ms. Beaver testified that A.M.K. is placed in a youth home in Stroudsburg, Pennsylvania. The minor children D.F.C., I.D.C, and C.F.C., are placed in a foster home in Hazelton, Pennsylvania. The minor child L.D.C. is placed in a foster home in Towanda, Pennsylvania and J.L.K., Junior and R.R.K. are placed in a foster home in Sayre, Pennsylvania.

According to Ms. Beaver, with the exception of A.M.K., the children are assimilated into their foster homes. Ms. Beaver testified that she has been at the foster homes as well as communicated with the families. N.T. 12/15/20 at 55. With respect to A.M.K., Ms. Beaver testified that A.M.K. is doing well in school, and Children and Youth is in the process of finding a permanent adoptive resource for her. According to Ms. Beaver, there are four potential families

25

available for A.M.K. *Id.* at 57. Ms. Beaver testified that each of the foster families for the children wish to adopt them. The foster families understand that in the event they are permitted to adopt the children, the children will have all of the rights that biological children would have to them, and they would inherit from their respective estates if they died intestate. Ms. Beaver testified that she did not have any concerns whatsoever in the event that the foster parents proceed to adopt the children. *Id.* at 57-58

Ms. Beaver testified that each foster parent for the minor children meet the children's respective physical needs. The foster parents provide the children's food, clothing, shelter and a safe environment and home. They also make sure that the children attend their medical appointments.

With respect to the minor children J.L.K., Jr. and R.R.K., Ms. Beaver stated that the foster parents meet their developmental needs. The children are involved in age-appropriate activities and have age-appropriate toys. The foster parents also ensured that J.L.K. Jr. was evaluated in order to meet his developmental needs. With respect to the minor children C.F.C., I.D.C., and D.F.C., their foster parents also meet their developmental needs. Ms. Beaver stated that all three children have an Individualized Educational Plan (I.E.P.) and are involved in trauma counseling. The foster parents ensure that the children have all they need for school and ensure that the girls are actively involved with their trauma therapy through "Red Bird." *Id.* at 58-60.

With regard to L.D.C., the foster mother meets her developmental needs. The minor child, L.D.C. also has an I.E.P. and is involved in trauma counseling. According to Ms. Beaver, the foster mother meets L.D.C.'s developmental needs.

26

The minor child, L.D.C., had struggled in English and Math. The foster mother obtained a tutor to help her in those subjects. *Id.* at 60.

With respect to the children's emotional needs, J.L.K., Jr. and R.R.K.'S emotional needs are met. *Id.* The foster parents provide the children with a safe and loving home and a nurturing environment. The foster parents treat the children as if they were their own biological children. They express love to the children and their love is reciprocated by the children. With regard to C.F.C., I.D.C., and D.F.C., the foster parents also meet the children's emotional needs. The foster parents are very loving and nurturing with the children. Ms. Beaver stated that there is a maternal bond and paternal bond with the children. The children are praised when they do something well. Both the foster parents and the children express love toward each other. *Id.* at 60-62

With respect to L.D.C., the foster mother also meets her emotional needs. L.D.C. has expressed that she feels safe in the foster mother's home. The foster mother treats L.D.C. as if she were her own biological daughter. Both the foster mother and L.D.C. express love toward each other. *Id.* at 61. With respect to A.M.K., Ms. Beaver testified that her physical needs are also met at the youth home. The minor child is provided with food, clothing, shelter, safe home and a nurturing environment. The minor child feels safe and is taken to all her medical appointments, dental appointments and doctor appointments. With respect to A.M.K.'s developmental needs, A.M.K., has an I.E.P. A.M.K.'s case manager works with her on a daily basis with her schoolwork. The minor child, A.M.K., was able to catch up and be placed in the appropriate grade. As a result, the minor child, A.M.K., is successful in school and was able to obtain honor roll

27

grades. The minor child, A.M.K., is also involved in trauma therapy. *Id.* at 63-64.

Ms. Beaver testified that all the children have been undergoing trauma counseling throughout the life of the case. The trauma counseling is geared towards sexual abuse, being witnesses of domestic violence, and being witnesses of drug usage. *Id.* at 83. Mr. Beaver testified that the Mother's brother previously sexually abused the children. The children confirmed that they were sexually abused by their maternal uncle. Ms. Beaver testified that there is an ongoing concern that Mother was aware of what her brother was doing to the children. *Id.* at 82. Ms. Beaver testified that Mother was informed of these allegations and Mother did not believe that her daughters were sexually abused by her brother. N.T. 1/12/21 p. 85.

Ms. Beaver testified that she observed visits between Mother and the minor children between December 2019 and October 2020. Based upon Ms. Beaver's observations, she found that the older children do not have a close bond with their mother. With respect to the younger children, the visits with their mother seem to be more of a "play date" rather than a parental child relationship.

While Mother was incarcerated in 2019, Mother had the children visit her three (3) times. Mother then indicated that it was her desire to no longer have visits with the children at the jail. Mother explained that she did not feel that having children come to visit her in prison was appropriate. *Id.* at 126-127, 136.

Ms. Beaver did not find Mother to be very nurturing during her in person visits with the children. According to Ms. Beaver, Mother tended to yell and "get worked up a lot" during the visits. Ms. Beaver testified that there were incidents

28

or situations in which Mother's visits with the children needed to be stopped due to concerns for the children. At one of the visits, in March 2020, Mother told Ms. Beaver that she needed to leave early from the visits because she had a doctor's appointment. Ms. Beaver proceeded to tell Mother that she needed to be notified of these changes ahead of time due to the travel of the foster parents. According to Ms. Beaver, Mother became "irate and started yelling, telling me to shut up and calling me a bitch". As a result of the incident, Ms. Beaver stated that the sheriff had to intervene, and she had to cancel the visit and Mother was escorted from the building. *Id.* at 66.

Another incident occurred when in-person visits resumed after Covid-19 restrictions were lifted. Ms. Beaver stated that visits were permitted, but parents were told that no visitors were permitted except for parents. Mother appeared at the visit with the maternal grandmother and maternal aunt despite the fact that mother was told of the policy. After visiting for one hour, a worker from Concern informed Mother and the maternal aunt that the visit was over and they needed to leave. The maternal grandmother proceeded to swear at the support worker in the presence of the children and became very angry. *Id.* at 66-67.

Ms. Beaver also testified that Mother was not consistent in attending her visits with the children. Mother was, therefore, placed on the "call-in list" in order to ensure that Mother confirms her visits due to her lack of consistency in attendance. According to Ms. Beaver, the foster families also reported that Mother was not consistent in visiting virtually with the children. *Id.* at 65.

Ms. Beaver testified that all of the children have a close bond with their foster parents. *Id.* at 63. Ms. Beaver testified that the relationship between the

29

children and the foster parents is positive, loving, and nurturing. The children now have stability and permanency. Ms. Beaver believes that the children would not suffer any detrimental effect should the Court terminate parents' parental rights. Ms. Beaver believes that adoption would be in the children's best interest.

With respect to the minor child A.M.K., although she is not residing in an adoptive resource home, Ms. Beaver still feels that termination of the parental rights would be in her best interest because the child would be free for adoption and it would assist in finding her an adoptive resource. *Id.* at 122.

Ms. Beth Distasio testified that she is the court appointed special advocate for the child, A.M.K. According to Ms. Distasio, A.M.K. expressed to her that she wishes to be adopted. *Id.* at 139-141.

Based upon the testimony of Ms. Beaver and Ms. Distasio, the court finds that the termination of Mother's parental rights would best serve the needs and welfare of the children.

## VI.   DISCUSSION: GROUNDS FOR TERMINATION OF MOTHER'S PARENTAL RIGHTS

### A.   23 Pa. C.S.A. Section 2511 (a)(8)

A Court may terminate parental rights under Section 2511(a)(8) when:

The child has been removed from the care of the parent by the Court or under Voluntary agreement with an agency, twelve (12) months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination would best serve the needs and welfare of the child.

Parental rights may be terminated under this provision of the Statute. Under 23 Pa.C.S.A. Section 2511(a)(8), the agency must show: (1) The child has been removed for at least twelve (12) months, (2) The conditions that gave rise to

placement continue to exist, and (3) Termination of parental rights would best serve the needs and welfare of the child.

## (1) **TIME PERIOD OF REMOVAL OF CHILD**

It is undisputed that minor children, R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr., have been removed from the custody of Mother, since January 7, 2019. Accordingly, this removal has persisted well in excess of the statutorily required twelve (12) months since the date of the children's placement. Thus, the requisite minimum of at least 12 months from removal of the minor children from their Mother has elapsed so as to comply with this section of 2511(8).

## (2) **CONDITIONS CONTINUING TO EXIST**

The conditions that led to the children's removal from Mother's care and into placement were Mother's inability to remain free from substance abuse, domestic violence concerns, mental health concerns and anger management concerns and lack of supervision concerns. The Court has performed the above extensive analysis in taking testimony and finding credible evidence in concluding that Mother failed to derive any benefit from services. Therefore, the conditions that gave rise to placement continue to exist.

In discussing and finding that the conditions continue to exist, the Court incorporates its reasoning and the testimony of all witnesses already discussed in this Memorandum found in the section addressing 23 PA. C.S. Section 2511 (a)(2).

## (3) **NEEDS AND WELFARE OF THE CHILD**

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child."

The Court has done this and finds the same considerations apply that have already been discussed extensively in this memorandum. Furthermore, the Court applies the same reasoning for concluding that these needs will be served by the termination of Mother's parental rights.

## VII.   **ADDITIONAL CONSIDERATIONS UNDER 23 PA.C.S.A. SECTION 2511(b)**

### **FOR MOTHER**

#### A.   **ENVIRONMENTAL FACTORS**

Title 23 Pa. C.S.A. Section 2511(b) specifies that a court may not terminate parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent."

As "environmental factors beyond the control of Mother" was not the linchpin in the placement of the minor children and because of the presence of other, independent factors utilized in the placement of R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr., this consideration does not apply and will not be addressed.

#### B.   **NEEDS AND WELFARE OF THE CHILDREN**

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the

32

developmental, physical and emotional needs and welfare of the child." This is to be a separate inquiry and even where the court has already considered the needs and the welfare of the child under one of the grounds of termination, the court must do so again. *In re Matsock*, 611 A.2d 738 (1992).

The Court has done this and finds the same considerations apply that have already been discussed extensively in this memorandum. Furthermore, the Court applies the same reasoning for concluding that these needs will be served by the termination of Mother's parental rights.

## VIII. ADOPTION AND SAFE FAMILIES ACT (ASFA) CONSIDERATIONS

The Pennsylvania Superior Court relied upon the Adoption and Safe Families Act (ASFA) in *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010). The goal of ASFA was described as follows:

> Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*Id.* at 1119-1120 citing *In re G.P,* 851 A.2d 967, 975-976 (Pa. Super. 2004)

The Court also provided that "above all else . . . adequate consideration must be given to the needs and welfare of the child . . . A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *Id.* at 1121 (internal citations omitted).

In reversing the trial court and terminating the natural parent's parental rights, the Superior Court held:

33

"ASFA-related policies now demand reasonable efforts within a reasonable time to remedy parental incapacity. Z.P has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification."

*Id.* at 1125-26.

These ASFA-related policies are applicable in the present case. The minor children, R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr. have been in placement for two years, since January 7, 2019. Accordingly, a reasonable time has long expired to remedy parental incapacity and there is little, rational prospect of the timely reunification of R.R.K., A.M.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr. to their Mother.

## IX. CONCLUSION

The Guardian *Ad Litem* in this case stated that terminating the Mother's parental rights serves the best interest of the children. The Court appointed counsel for A.M.K. also stated that although A.M.K. did not yet find an adoptive resource home, it would be in her best interest to have her Mother's rights terminated. This would free A.M.K. for adoption.

This court finds that the Mother cannot offer to her children the basic physical, developmental and emotional needs that her children require and should have throughout their future life. Mother has been given ample time to address and remedy her problems, but has failed to successfully do so. The Court finds that she is not able to meet her children's needs. In stark contrast, the foster parents have amply demonstrated they meet the physical, developmental and emotional needs of the minor children, R.R.K., L.D.C., I.D.C., D.F.C., C.F.C. and J.L.K., Jr., and they have thrived under their care. The minor child A.M.K.

34

also wants to be adopted, and there is work being done in helping her to find an appropriate home. The children need consistency and deserve a permanent home with loving capable parents. The only way to provide this is to terminate the rights of the Mother. Clearly it is in the children's best interest to do so.

Respectfully submitted,

BY THE COURT,

_____
JENNIFER L. ROGERS                    J.

DATE: 3|19|21

COPIES TO:

Christopher Harrison, Esquire
Children & Youth Services
of Luzerne County
111 North Pennsylvania Boulevard
Wilkes-Barre, PA 18701

Robert L. Koblinski, Esquire
4940 Birney Avenue
Moosic, PA 18507

Tiffany D. Crispell, Esquire
Guardian Ad Litem
9 Powder Mill Road
Pittston, PA 18640

Maria M. Turetsky, Esquire
Legal Counsel for A.M.K.
105 Winchester Way
Scranton, PA 18504